UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARY CONNOR on behalf of her Minor Child I.C.,

Plaintiff,

v.

NEW YORK CITY DEPARTMENT OF EDUCATION,

Defendant.

**MEMORANDUM & ORDER**

No. 08 Civ. 7710 (LBS)

SAND, J.:

Plaintiff, Mary Connor, brings this action on behalf of her son, I.C., pursuant to the Individuals with Disabilities in Education Act ("IDEA") against the New York City Department of Education ("DOE"). Plaintiff appeals from the decision of the State Review Officer ("SRO"), which annulled the decision of the Impartial Hearing Officer ("IHO"). The SRO found that the DOE's proposed individualized education plan ("IEP") fulfilled the requirements under IDEA and did not deny her son a free appropriate public education. The SRO denied Plaintiff's request for $38,000 in tuition reimbursement for the private school at which she unilaterally[1] choose to enroll her son for the 2007-2008 school year.[2] Plaintiff appeals the SRO decision and alleges that her son was denied a free appropriate public education as required by IDEA and seeks reimbursement for

[1] Plaintiff signed a contract with the Aaron School to enroll her son for the 2007-2008 school year before the DOE had prepared a revised IEP or selected a classroom placement for her son. (Def.'s 56.1 Statement ¶¶ 50-51.)
[2] Defendant did not appeal to the SRO the award of transportation.

tuition. The parties now cross-move for summary judgment. For the following reasons, this Court grants summary judgment in favor of Defendant.

## I. Background

I.C., son of Plaintiff Mary Connor, was first referred for education services in kindergarten as a result of his high activity and occasional inappropriate behavior. (Pl.'s 56.1 Statement ¶ 2; Def.'s 56.1 Statement ¶ 1.)[3] In 2003, the DOE conducted a speech and language evaluation, psychological evaluation, classroom observation and reviewed I.C.'s social history. (Def.'s 56.1 Statement ¶ 2.) He was diagnosed with a neurological impairment and classified for special education purposes as "other health impaired." (Def.'s 56.1 Statement ¶ 3.) The DOE's Committee on Special Education ("CSE") developed an IEP for I.C., which, among other things, recommended that I.C. be placed in a collaborative team teaching class. He continued to attend New York City public schools in collaborative team teaching classes through the fourth grade. (Def.'s 56.1 Statement ¶ 5.) During his fourth grade year, Plaintiff noticed that her son was having greater problems in school. In September 2006, her son was diagnosed with Asperger's disorder. (Def.'s 56.1 Statement ¶ 9.) Throughout the school year the CSE held three meetings, which Plaintiff participated in, to review I.C.'s IEP. Additionally, the school psychologist conducted a classroom observation of I.C. in January of 2007. (Def.'s 56.1 Statement ¶ 10.) At Plaintiff's request, the school psychologist conducted a new

[3] In Defendant's Response to Plaintiff's Rule 56.1 Statement, the DOE alleges that because Plaintiff failed to respond to Defendant's 56.1 Statement, those facts are deemed admitted. This is a misstatement of the caselaw that the DOE itself cites. Though the failure to respond to a 56.1 statement *may* result in those facts being admitted, this Court has broad discretion to "avoid penalizing parties harshly as a result of technical errors by their attorneys, and 'will deem the facts set forth in plaintiff's memorandum of law sufficient to satisfy Rule 56.1 to the extent that the rule is otherwise complied with. However, where a stated fact is nowhere controverted, it will be deemed admitted.'" *Jessamy v. New Rochelle*, 292 F. Supp. 2d 498, 504-05 (S.D.N.Y. 2003) (quoting *Williams v. R.H. Donnelley, Inc.*, 199 F. Supp. 2d 172, 173 n.1 (S.D.N.Y. 2002)).

educational evaluation in June prior to the CSE's final meeting. (Def.'s 56.1 Statement ¶¶ 18-19.)

On June 8, 2007 the CSE met and prepared a new IEP for I.C., which continued to classify him as "other health impaired," but recommended he move from his current collaborative team teaching placement to a more restrictive special education class with a 12:1 student to teacher ratio and additional services. (Pl.'s 56.1 Statement ¶ 10.) In July after the final CSE meeting, the DOE sent Plaintiff the Final Notice of Recommendation, which proposed that I.C. be placed at P.S. 217. (Def.'s 56.1 Statement ¶ 22.) The total student body at P.S. 217 was four hundred and fifty students, including approximately thirty special education students in three self-contained classrooms. The CSE proposed placing I.C. in a class consisting of third, fourth, and fifth grade special education students varying in age from eight to eleven years old. (Def.'s 56.1 Statement ¶¶ 41-42.)

In December 2006, Plaintiff submitted an application for her son to attend the Aaron School. (Def.'s 56.1 Statement ¶ 50.) I.C. was accepted to the Aaron School and in March 2007 Plaintiff signed a contract with the school to pay $38,000 in tuition for the 2007-2008 school year. In addition, Plaintiff paid a non-refundable $7,000 payment to the school. (Def.'s 56.1 Statement ¶ 51.) On August 1, 2007, after Plaintiff had received the final recommendation, she wrote to the CSE informing it that her son would be attending the Aaron School. On August 20, Plaintiff wrote again stating that the DOE had not offered her son a free appropriate public education and she intended to seek tuition reimbursement, transportation and related services. (Def.'s 56.1 Statement ¶¶ 16, 19.) In September 2007, Plaintiff requested an impartial hearing in order to seek reimbursement.

The IHO concluded that Plaintiff's son had been denied a free appropriate public education because the IEP was procedurally and substantively defective. The IHO based its decision on the following findings: (1) the general education teacher was absent for the first five to ten minutes of the June 2007 meeting; (2) the age variance in the proposed placement classroom exceeded thirty-six months; (3) the total student population of P.S. 217 was too large; (4) Plaintiff was denied a meaningful opportunity to participate in the CSE meeting; (5) the DOE was legally obligated to conduct a functional behavior analysis ("FBA") and failed to do so or develop a behavior modification plan; and (6) the DOE was required to conduct a psychological evaluation because of I.C.'s Asperger's diagnosis but failed to do so. (IHO Decision at 14-17.) The IHO concluded that the Aaron School was an appropriate placement for I.C. and that Plaintiff should be reimbursed tuition costs and to provide her with transportation. (IHO Decision at 17.)

The DOE appealed the IHO decision to the SRO. The SRO sustained the DOE's appeal and annulled the IHO decision. In a detailed and meticulous decision, the SRO explained that Plaintiff had not met her burden to establish that her child was denied a free appropriate public education for the 2007-2008 school year. (SRO Decision at 19.) The SRO rejected the parent's claim that the IEP was procedurally or substantively defective, and therefore did not reach the question of whether or not the Aaron School (a for profit institution which lacked state approval) was an appropriate placement. (SRO Decision at 19.)

## II. Discussion

### a. The Individuals with Disabilities Education Act

The Individuals with Disabilities Education Act ("IDEA") seeks to "open the door of public education to handicapped children." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 192 (1982). The purpose of IDEA is "to bring previously excluded handicapped children into the public education systems of the States and to require the States to adopt procedures which would result in individualized consideration of and instruction for each child." *Id.* at 189. Under IDEA, Congress provides funds to those states that "develop plans to assure 'all children with disabilities the right to a free appropriate public education.'" *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998) (citing 20 U.S.C. § 1412(1)). A free appropriate public education must consist of "educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." *Rowley*, 458 U.S. at 188-89.

Though the Supreme Court has held that IDEA guarantees only a "basic floor of opportunity," at a minimum some educational benefit must be conferred upon the handicapped child. *Rowley*, 458 U.S. at 200-01 ("It would do little good for Congress to spend millions of dollars in providing access to a public education only to have the handicapped child receive no benefit from that education."). The educational needs of a disabled child and the corresponding required services must be set forth in an IEP.[4] In

[4] Under IDEA, an IEP is required to state: "(1) the child's present level of educational performance; (2) the annual goals for the child, including short-term instructional objectives; (3) the specific educational services to be provided to the child and the extent to which the child will be able to participate in regular educational programs; (4) the transition services needed for a child as he or she begins to leave a school setting; (5) the projected initiation date and duration for the proposed services; and (6) objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved." *Walczak*, 142 F.3d at 122.

New York, the State has assigned the responsibility of developing IEPs to the Committee on Special Education ("CSE"). The CSE looks at four aspects of the child's development: "(1) academic achievement and learning characteristics, (2) social development, (3) physical development, and (4) managerial or behavioral needs." *Walczak*, 142 F.3d at 123. If a parent is dissatisfied with the IEP, he or she can appeal to an impartial hearing officer ("IHO"). In turn, that decision can be appealed to the state review officer ("SRO"). After the SRO decision, a party can seek relief in state or federal court.

**b. Standard of Review**

Under IDEA, a federal court conducts an independent review of the administrative evidence and, basing its decision on the preponderance of the evidence, grants relief where appropriate. *Rowley*, 458 U.S. at 205. However, the Supreme Court has made clear that this "independent review" is "by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Id.* at 206. Federal courts are not to "rubber stamp" administrative decisions, but "they are expected to give 'due weight' to these proceedings, mindful that the judiciary generally 'lack[s] the specialized knowledge and experience' necessary to resolve 'persistent and difficult questions of educational policy.'" *Walczak*, 142 F.3d at 129 (citations omitted); *see also Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 188 (2d Cir. 2005). The Court of Appeals for the Second Circuit has vacated district court judgments in which the district court applies its own personal views on education policy and methodology when conducting this independent

review. *See Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 114 (2d Cir. 2007); *Cerra*, 427 F.3d at 193-194; *Walczak*, 142 F.3d at 131.

The burden of proof is on the party seeking review. *Schaffer v. Weast*, 546 U.S. 49, 62 (2005). A parent can meet its burden by showing that (1) the state did not comply with the procedural requirements of IDEA; or (2) the challenged IEP was not "reasonably calculated to enable a child to receive educational benefits." *Rowley*, 458 U.S. at 206-07. If the IEP is found to be deficient, the court must determine whether the parental placement was appropriate. *Walczak*, 142 F.3d at 129. The SRO decision, as the final decision of the state, is given "due weight" even when it differs from the earlier decision of the IHO. *A.C. ex rel. M.C. v. Bd. of Educ. of The Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir. 2009) ("If the SRO's decision conflicts with the earlier decision of the IHO, the IHO's decision 'may be afforded diminished weight.' We 'defer to the final decision of the state authorities,' even where 'the reviewing authority disagrees with the hearing officer.'") (citations omitted). Deference is particularly warranted where the state decision is thorough and careful. *Walczak*, 142 F.3d at 129.

**c. Analysis**

We note at the outset that the SRO decision is careful and detailed in its analysis of Plaintiff's claims and, therefore, warrants deference. The procedural requirements of IDEA are not mere formalities; rather they act as "safeguards" of the rights protected by IDEA. *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 381 (2d Cir. 2003). Whereas the substantive standard of IDEA is ambiguous, the procedural requirements are useful markers to determine whether the substantive standard envisioned by IDEA is fulfilled. *Rowley*, 458 U.S. at 205 ("We think that the congressional emphasis upon full

participation of concerned parties throughout the development of the IEP, as well as the requirements that state and local plans be submitted to the Secretary for approval, demonstrates the legislative conviction that adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP.").

Plaintiff claims the IEP was procedurally deficient because the school district did not conduct a functional behavior analysis ("FBA") or a psychological evaluation. Under New York law, the school district must conduct an FBA in developing an IEP "for a student whose behavior impedes his or her learning or that of others, as necessary to ascertain the physical, mental, behavioral and emotional factors which contribute to the suspected disabilities." 8 N.Y.C.R.R. § 200.4(b)(1)(v). The SRO found that a FBA was not necessary based on the district psychologist's determination that I.C.'s behavior was appropriate in the classroom and the psychologist's testimony regarding a June 2007 educational evaluation that "despite [I.C.'s] anxiety and fidgeting" the district was not required to conduct a FBA. (SRO Decision at 14.)

Even if the school district was required to conduct a FBA, its failure to do so would not necessarily render the IEP legally inadequate under IDEA. *See A.C*, 553 F.3d at 172 (2d Cir. 2009). Although school districts must comply with all IDEA procedures, "it does not follow that every procedural error in the development of an IEP renders that IEP legally inadequate under the IDEA." *Grim*, 346 F.3d at 381. IDEA requires that "in developing an IEP for 'a child whose behavior impedes the child's learning,' the school district must 'consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior.'" *Id*. (citing 20 U.S.C. § 1414(d)(3)(B)(i)). If

the DOE fulfilled the IDEA procedural requirements, a failure to conduct a FBA, even if the FBA was required under New York law, will not constitute a denial of a free appropriate public education.

The SRO reviewed the various steps that the school district took to assess I.C.'s behavioral needs and concluded that the procedural requirements of IDEA were fulfilled even though a FBA was not conducted. (SRO Decision at 14.) *Rowley* requires that we give "due weight" to the SRO's determinations regarding implementation of the statute. 458 U.S. at 206; *see Grim*, 346 F.3d at 382. Nothing in the record suggests any reason to diverge from the determination of the SRO. The school district relied on the 2003 psychological evaluation, January 2007 classroom observation, and June 2007 academic testing in developing the new IEP for I.C.. The DOE psychologist, through observation and testing, identified the challenges I.C. faced as a result of his behavioral problems. The IEP modified I.C.'s classroom setting from a collaborative team teaching environment to the more restrictive 12:1 self-contained class at P.S. 217. (Pl.'s 56.1 Statement ¶ 10.) The IEP identified his problems with focusing and coping with change and established eleven annual goals, along with related services, including occupational therapy and assistive technology. (Def.'s 56.1 Statement ¶ 25.) The DOE not only considered I.C.'s individual needs but put in place specific behavior interventions and supports to address those needs. Whether the DOE's strategy in addressing I.C.'s behavioral problems was sufficient is "precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers." *Grim*, 346 F.3d at 382. We find that the school district properly developed procedures and services in compliance with the procedural requirements of IDEA.

Similarly, the failure to conduct a psychological re-evaluation does not render the IEP procedurally defective. Plaintiff claims that the IEP is flawed because the DOE refused to conduct a psychological re-evaluation in 2007. Plaintiff contends the DOE improperly relied on an outdated evaluation, despite her son's 2006 Asperger's diagnosis, in creating I.C.'s new IEP. The IHO agreed, finding that the DOE was required to conduct a psychological evaluation because the school psychologist Adrian Tubero knew of the diagnosis and believed herself that I.C. had Asperger's disorder. (IHO Decision at 16-17.) If the psychologist had relied exclusively on the 2003 evaluation without regard to I.C.'s Asperger's diagnosis, Plaintiff might have sustained her burden of proof. But, as the SRO Decision demonstrates in an in-depth detailed and extensive analysis dedicated solely to this issue, that was not the case. (SRO Decision at 13-15.) In addition to the 2003 evaluation, the psychologist relied on a January 2007 classroom observation and a March 2007 augmentative and alternative communication evaluation. (SRO Decision at 13.) Additionally, in the process of developing I.C.'s new IEP, the psychologist spoke with I.C.'s teacher and occupational therapist. The psychologist, who was aware of the new diagnosis, used multiple tools and various observations to conduct an up to date analysis of the child's behavior and psychological needs. Once again we defer to the "careful and thorough" analysis of the SRO, which is supported by the abovementioned record, and find the failure to conduct a psychological re-evaluation does not render the IEP procedurally deficient. *Walczak*, 142 F.3d at 129

Plaintiff makes a number of other procedural objections to the IEP: a general education teacher was absent for the beginning of the CSE meeting in June; Plaintiff was denied a meaningful opportunity to participate in establishing her son's IEP goals; the

IEP goals did not appropriately address the child's needs; and the IEP did not contain any auditory processing goals because an auditory processing evaluation was not conducted. The SRO reviewed these claims in detail and found no violations. (SRO Decision at 19.) This Court has examined these claims and agrees with the SRO that they are without merit for the reasons that are set forth by the SRO.

Having found that the state complied with the procedural requirements of IDEA, we must ask whether the challenged IEP was "reasonably calculated to enable a child to receive educational benefits." *Rowley*, 458 U.S. at 206-07. But IDEA seeks to ensure equal access to education for the handicapped; thus, it seeks more to "open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside." *Walczak*, 142 F.3d at 130. Though IDEA guarantees only a "basic floor of opportunity," this standard is not met if the IEP affords only the opportunity for "trivial advancement." *Cerra*, 427 F.3d at 194-195. "[T]he door of public education must be opened for a disabled child in a 'meaningful' way." *Walczak*, 142 F.3d at 130.

Plaintiff claims that placement at P.S. 217 would not satisfy the substantive requirements of IDEA because its student body is too large and the age range of the proposed class is too wide. [5] Plaintiff experienced concern that I.C. would have had difficulty navigating the hallways and shared spaces at such a large school. Similarly, the

---

[5] Although we need not address the appropriateness of the placement at Aaron School, the Court notes that the flaws of the Aaron School placement cast doubt on the objectivity of Plaintiff's substantive challenges to the IEP. Not only does Aaron not offer Plaintiff's son the opportunity to mainstream but when he enrolled he repeated the fourth grade, even though I.C. is at or above academic grade level. Furthermore, the record calls into question whether Plaintiff had any intention of continuing to send her son to public school, regardless of what placement the DOE proposed. On March 21, 2007 Plaintiff agreed to pay $38,000 tuition for the 2007-2008 school year and made an initial non-refundable $7,000 payment. (Def.'s 56.1 Statement ¶ 51.) This payment occurred almost three months prior to the final IEP which proposed placement for I.C. at P.S. 217. Plaintiff visited P.S. 217 September 12, 2007, at least a week after school had started, and she remained for only ten minutes. (Def.'s 56.1 Statement ¶ 57.)

class profile demonstrates that I.C. would have been one of the most advanced students both in age and function level in his self-contained classroom. IDEA does not require perfection; all that is required is that the IEP be likely to produce progress and not regression. *Frank G. v. Bd. of Ed. of Hyde Park*, 459 F.3d 356, 364 (2d Cir. 2006). No single factor is dispositive as to whether an IEP is likely to produce progress. *Walczak*, 142 F.3d at 130. A district court must look to the record and examine any objective evidence, which indicates whether a child is likely to make progress. *Walczak*, 142 F.3d at 130. A court is to look at the totality of the circumstances in making this determination. *Frank G.*, 459 F.3d at 364.

In support of her contention of substantive deficiency, Plaintiff relies on a New York law, which states that in special education classes of students sixteen years old or younger, "chronological age range within special classes of students with disabilities who are less than 16 years of age shall not exceed 36 months." 8 N.Y.C.R.R. 200.6(h)(5). Nothing in the record indicates that the proposed age range exceeded 36 months. The class included children who were eight, nine, ten and eleven. Though it is possible that the class could have included a young eight year old and an old eleven year old, thus exceeding the chronological age requirement, no evidence has been offered to demonstrate that this is the case. Even if the record established that the range exceeded thirty-six months, the placement would not be deemed inappropriate automatically. In order to ensure that students with disabilities are grouped in like groups, New York law instructs school districts to look to academic and educational achievement, social development, physical development, and management needs. 8 N.Y.C.R.R. 200.6(a)(3). If a classroom composition exceeds the thirty-six month range, but the students were

properly grouped together on factors other than chronological age the grouping is acceptable. (SRO Decision at 16.) The SRO looked at the break down of the students' chronological age and the academic and behavior function levels in the class profile. (SRO Decision at 17.) Ultimately, the SRO concluded that, though the age range might exceed thirty-six months, the grouping was proper. We agree.

None of the alleged defects in the proposed placement at P.S. 217 support a finding that Plaintiff's son was denied a free appropriate public education. In looking at the totality of the circumstances, the objective evidence supports the finding that I.C. could make meaningful progress in the school district's placement. *Frank G.*, 459 F.3d at 364; *Walczak*, 142 F.3d at 130. The class size was small and taught by an experienced special education teacher. (Def.'s 56.1 Statement ¶¶ 29, 37.) Unlike the Aaron School, which is exclusively for special education students, P.S. 217 offered I.C. the opportunity to enter mainstream education if it became appropriate. Under IDEA, there is a statutory preference to place a child in the least restrictive environment possible. *Walczak*, 142 F.3d at 132. At P.S. 217, I.C. would have had the opportunity to transfer to a general education classroom if it became appropriate without having to transfer schools. Based on the abovementioned evidence, we find that the placement was reasonably calculated to enable I.C. to receive educational benefits.

We conclude the challenged IEP is procedurally and substantively valid and, therefore, I.C. was not denied a free appropriate public education. Having found that the IEP was not procedurally or substantively deficient, we need not address the issue of whether or not the unilateral parental placement was appropriate. Nor need we address the issue raised by the DOE as to whether the Aaron School's status as a for profit

institution which lacked state approval disqualifies Plaintiff from seeking reimbursement for tuition paid to it.

## III. Conclusion

For the foregoing reasons, the Defendant's motion for summary judgment is granted and Plaintiff's cross-motion is denied.

**SO ORDERED.**

Dated: Oct. 13 2009
New York, NY

Leonard B. Sand
**U.S.D.J.**